RICHARD F. BOULWARE, II, UNITED STATES DISTRICT JUDGE
I. INTRODUCTION
Plaintiffs in this case are Deborah Sanzaro ("Mrs. Sanzaro") and Michael Sanzaro ("Mr. Sanzaro") (collectively, "Plaintiffs" or "the Sanzaros"). Plaintiffs are homeowners and members of the Ardiente Homeowners Association ("HOA"). This case involves three incidents between 2009 and 2011, during which Mrs. Sanzaro, alone or accompanied by Mr. Sanzaro, attempted to enter the Ardiente HOA clubhouse ("the Ardiente clubhouse") with Mrs. Sanzaro's alleged service animal, a Chihuahua named Angel. On each of these three occasions, Mrs. Sanzaro was denied access to the clubhouse while accompanied by Angel. The Court held a bench trial in this case on April 9, 2018, April 10, 2018, April 16, 2018, April 17, 2018, April 18, 2018, April 20, 2018, and May 11, 2018. The Court rules in favor of Plaintiffs based on the following findings of fact and conclusions of law.
II. PROCEDURAL HISTORY
Plaintiffs' operative Amended Complaint was filed on July 22, 2013. (ECF No. 78). Plaintiffs brought 102 causes of action for "discrimination against the disabled, breach of contract and other torts," including claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, and the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 - 19, and NRS § 651.075. On November 29, 2017 the Court entered an order on various motions, including a motion for summary judgment filed by Plaintiffs, which the Court denied. (ECF No. 381). The remaining causes of action were Claims 1, 2, 6, 7, 11, and 12 which relate to *1164 the three incidents that took place on March 11, 2009 ("Incident 1"), July 26, 2010 ("Incident 2"), and January 29, 2011 ("Incident 3"). Based on these causes of action and the prior rulings of the Court, the issues remaining for trial were: (1) whether the HOA clubhouse was a place of public accommodation under the ADA and NRS § 651.075, and (2) whether Plaintiffs requested, and were ultimately refused, a reasonable accommodation under the FHA.[1]
III. JURISDICTION AND VENUE
This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 for claims arising under the ADA and the FHA. The Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367. Venue is proper because the underlying actions and corresponding damages occurred within Clark County, Nevada.
IV. FINDINGS OF FACT
Federal Rule of Civil Procedure 52(a)(1) requires the Court to "find the facts specially and state its conclusions of law separately" in a bench trial. Fed. R. Civ. P. 52(a)(1). Factual findings must be sufficient to indicate the basis for the Court's ultimate conclusion. Unt v. Aerospace Corp., 765 F.2d 1440, 1444-45 (9th Cir. 1985) (citing Kelley v. Everglades Drainage Dist., 319 U.S. 415, 422, 63 S.Ct. 1141, 87 L.Ed. 1485 (1943) ). The findings must be "explicit enough to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision." United States v. Alpine Land & Reservoir Co., 697 F.2d 851, 856 (9th Cir. 1983), cert. denied, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983) (citations and quotation marks omitted). Accordingly, the Court makes the following findings of fact on this matter.
1. The Ardiente HOA
a. Ardiente is a restricted-access residential HOA neighborhood located in North Las Vegas, Nevada. The community is gated and requires a remote transponder or access code for entry. Members of the public cannot enter the Ardiente community without prior permission from the property management unless they have assistance or consent from a current homeowner for a particular visit.
b. In addition to private residences, the community contains common-use facilities such as the Ardiente clubhouse. The Ardiente clubhouse has several amenities including a gym, a pool and sauna, and rooms to rent for private events. The Ardiente clubhouse also has restricted access, monitored by Ardiente and property management staff. Members of the public cannot enter the Ardiente clubhouse without prior permission from staff. The office for Ardiente is located within the clubhouse.
c. At all times relevant to this litigation, the Declarant-either Defendant Corona Ardiente ("Corona") or non-party Shea Homes-hosted programs called "Stay and Play" and "Taste of the Good Life," in which members of the public who were not residents of the Ardiente community could stay overnight in an Ardiente model home and access community facilities, including the clubhouse.
*1165 The purpose of these programs was to induce these guests to purchase an Ardiente home. Members of the public were not permitted to access the Ardiente community and facilities unless they indicated potential interest in purchasing a home within the community and were part of the aforementioned marketing programs.
d. In October 2010, Shea Homes hosted a Grand Opening of the Ardiente community, which was advertised to the public in the local newspaper. As part of the Grand Opening, activities such as yoga, dog training, and line dancing occurred inside of the clubhouse. The purpose of the event was to induce members of the public to purchase an Ardiente home.
2. The Parties
a. Since August 2007, Plaintiffs have been owners of a single family home within the Ardiente community located at 3609 Inverness Grove, North Las Vegas, Nevada. The value of Plaintiffs' home at the time of purchase was $ 212,800.00.
b. Plaintiffs lived in their Ardiente home from October 2008 to January 2018. Plaintiffs used the Ardiente clubhouse facilities without incident two to three times per day on average between November 2008 and March 2009. While Plaintiffs still own the home, they moved out of the home and away from the Ardiente community due to ongoing and persistent harassment and threats, which they continue to experience in connection with the events described herein.
c. Defendant Ardiente Homeowners Association ("Ardiente" or "the HOA") is the entity that maintains and operates the community. Ardiente is governed by a Board of Directors ("the Board") pursuant to its governing documents, including Bylaws, Rules & Regulations, and a Declaration of Covenants, Conditions, Restrictions ("CC & Rs") (collectively, "Ardiente's governing documents"). Plaintiffs received a copy of these governing documents when they purchased their home
d. Pursuant to Ardiente's governing documents, at the time Plaintiffs purchased their home and until 2010, the majority of the Board positions were filled by the Declarant, with remaining seats filled by homeowners.
e. Defendant Corona was the Declarant prior to non-party Shea Homes. Under the terms of the CC & Rs and Bylaws, the Declarant developed the community and sold lots to homeowners. The Declarant also had authority to appoint and oversee voting members to the Board.
f. Neither Ardiente nor Corona provided any training to their Board representatives or relevant employees about the requirements or prohibitions of the ADA, FHA, or NRS § 651.075, such as what, if any, documentation is required to establish that an animal is a service or assistance animal.
g. Neither Ardiente nor Corona provided any training to their Board representatives about how to engage with homeowners seeking to bring service or assistance animals into the clubhouse.
h. Defendant RMI Management, LLC ("RMI") was the property management company hired by the community developer. RMI managed Ardiente between 2009 and 2011. During the Incidents at issue in *1166 this case, RMI property management staff were employed at Ardiente facilities, including at the Ardiente clubhouse. RMI employed property managers, called Community Managers, at all relevant times during the events that gave rise to this litigation.
i. RMI did not provide any training to its Community Managers about the requirements or prohibitions of the ADA, FHA, or NRS § 651.075, such as what, if any, documentation is required to establish that an animal is a service or assistance animal.
j. RMI did not provide any training to its Community Managers about how to engage with homeowners seeking to bring service or assistance animals into the clubhouse.
k. Defendant Scott Harris ("Harris") is a former member of the Ardiente Board and former appointee of Corona. Harris was a voting Board member during the first Incident involving the Sanzaros. Harris participated in and ratified decisions regarding the Sanzaros, including to prohibit them from accessing the clubhouse.
l. Defendant Ryan Smith ("Smith") was a member of the Ardiente Board between February 2010 and January 2013. Smith took over the position from Harris. Smith was appointed to the Board by Corona, and was an employee of non-party successor Declarant Shea Homes. Smith was a voting Board member during the second and third Incidents involving the Sanzaros. Smith participated in and ratified decisions regarding the Sanzaros, including to prohibit them from accessing the clubhouse.
m. Defendant Kevin Wallace ("Wallace") is the Chief Executive Officer of RMI. Wallace was not a member of the Board and had no authority to vote on Board decisions. Wallace never attended any Board meetings, and did not communicate directly with the Sanzaros.
n. Defendant Laury Phelps was the Community Manager of the Ardiente community, and a former employee of RMI, between 2007 and 2010. She was the Community Manager during the first two Incidents involving the Sanzaros. During her tenure, Phelps sent out communications regarding animals in the Ardiente clubhouse to Ardiente homeowners, including the Sanzaros, on behalf of the Board. She also actively prevented the Sanzaros from entering the Ardiente clubhouse with Angel at the direction of the Board. However, she was not a voting member of the Board.
3. Mrs. Sanzaro's Disability and Use of an Assistance Animal
a. Mrs. Sanzaro became disabled on March 12, 2004. Her disability is permanent, impedes her ability to walk without assistance, and generates significant and ongoing incidents of pain.
b. As a result of her disability, Mrs. Sanzaro uses a walker.
c. Mrs. Sanzaro needed, and continues to need, the assistance of a service dog in or around October 2008 until the present, and began using the services of Angel, a Chihuahua, at that time.
d. Between November 2008 and February 2009, Angel was trained to assist Mrs. Sanzaro with her disability. Initially, Angel assisted Mrs. Sanzaro in coping with acute pain arising from Mrs. Sanzaro's disability. Angel was subsequently trained *1167 to retrieve Mrs. Sanzaro's walker and car keys in the event that those items were out of Mrs. Sanzaro's reach.
4. 2009 Incident and Interactions between Plaintiffs and Defendants
a. Incident 1 occurred at the clubhouse on March 11, 2009. That day, Mrs. Sanzaro entered the clubhouse with Angel and her walker. Defendant Phelps, then Community Manager of the HOA, was working at the clubhouse that day. Prior to this incident, Phelps had seen Mrs. Sanzaro use her walker and was aware that Mrs. Sanzaro suffered from a physical impairment that significantly impaired her ability to walk. Phelps asked Mrs. Sanzaro why the dog was in the clubhouse. Sanzaro then explained that the dog assisted her with her disability as a service animal. Phelps asked Mrs. Sanzaro if she had with her any documentation for the dog, and Mrs. Sanzaro responded that she did not. Phelps then asked Mrs. Sanzaro to leave. When Mrs. Sanzaro refused to leave, Phelps called the HOA's attorney and also called security. After security was called, Mrs. Sanzaro left the clubhouse with Angel.
b. On March 13, 2009, Phelps sent an email on behalf of the HOA Board with subject line "RE: Animals in the clubhouse," stating in part: "Persons with service animals should notify the clubhouse staff about their service animal when they come into the clubhouse, or let the clubhouse staff know, if asked, that the animal is a service animal. If a homeowner refuses to say whether the animal is a service animal or not, the animal will have to stay outside of the clubhouse. If you do have certification papers, it would be helpful to provide them for inclusion in your file."
c. The same day, Mrs. Sanzaro entered the clubhouse with Angel, without incident.
d. Additionally on March 13, 2009, counsel for the HOA sent Plaintiffs a letter describing Incident 1 as a violation of the HOA's governing documents, and also informing Plaintiffs that a hearing before the HOA Board regarding the incident before the HOA Board would be set for March 30, 2009. The letter stated in part: "[T]his letter is a formal request that, at the hearing, you provide the [HOA] with additional documentation from Mrs. Sanzaro's doctors to substantiate the existence of a handicap/disability and the necessity for the presence of the dog in the clubhouse in order to accommodate that handicap/disability."
e. On March 16, 2009, Phelps sent another email to Ardiente homeowners on behalf of the Board, stating in part: "The clubhouse staff wants everyone to know that if someone enters the clubhouse with a legitimate service animal, and properly advises the staff of such, that person will be granted all privileges and assistance by the staff to accommodate their disability.... If you have a service animal, and require them to be in the clubhouse, please advise the staff so that we can properly accommodate you and your service animal."
f. On March 29, 2009, non-party James Marsh ("Marsh"), then President of the HOA and homeowner representative on the HOA Board, sent a letter to Ardiente homeowners regarding Plaintiffs' hearing set the following day. In the letter, Marsh *1168 stated that, although he was "not at liberty to discuss the nature and extent of the alleged violations" against the Sanzaros, he nonetheless "[could] ensure [homeowners] that Mr. Sanzaro's recitation of the facts is inaccurate, self-serving and intentionally misleading." He further informed homeowners that Mrs. Sanzaro did not introduce her dog as a service animal to staff and never presented documentation that the dog was a service animal during Incident 1. He concluded the letter by writing "I, and the Board, sincerely apologize to all of you that have had to endure Mr. and Mrs. Sanzaro's emails to assist him in furthering his personal vendetta against you, the HOA." Marsh sent the letter on behalf of the Board and at the direction of counsel for the HOA.
g. On March 30, 2009, a hearing was held before the HOA regarding Incident 1. The meeting was conducted in "open" format such that other Ardiente homeowners were permitted to attend. Plaintiffs were not present.
h. Beginning in March 2009 and at least through 2010, the Sanzaros received hate letters and emails as well as verbal harassment from other homeowners in the Ardiente community regarding the Sanzaros' dispute with the Board over Angel's documentation. At no point did representatives of Ardiente or Corona, Board member Harris, or Phelps take any action to discourage homeowners from harassing the Sanzaros despite being aware of the harassment and threats.
i. After the March 30, 2009 hearing, an Ardiente homeowner anonymously sent the Sanzaros a letter that read in part: "We hear you are going to file a lawsuit against the HOA and us. Jim [Marsh] was right when he told a large group of us at Sage Park a couple years ago that you are going to cost each of us a lot of money.... Leave this community. We don't want you here.... You and [Mrs. Sanzaro] have lost every action against the HOA.... Don't sue us. Just get the hell out of here! If you sue us I hope your little dog gets loose and someone catches it and drops it deep in the desert...."
ii. On approximately June 21, 2009, the Sanzaros found a letter tucked inside of their door handle which read in part: "Our group has combined our efforts to rid our community of undesirables such as you two. The board meeting a few days ago was only a small example of our combined power. In a meeting attended by many homeowners our group devised a plan to disrupt the two of you from speaking at the board meeting. As you know it worked very well. You two looked like idiots trying to talk. Our group followed our plan and heckled and yelled obscenities at you until you were force [sic] to stop talking and sit down. Jim [Marsh] said he would not stop us from heckling you.... At first you two were a fun part of this community, but when you turned on Jim Marsh and Laury Phelps your fight against them and [Ardiente] became our fight against you two. A very good proverb works well here. An enemy of our friend is our enemy. Do our community a big favor, GET THE HELL OUT OF OUR COMMUNITY!" The letter was signed by *1169 "Ardiente Residents for Solidarity."
iii. At some point in Summer 2009, an anonymous homeowner spray painted a threatening message on the Sanzaros' garage door, telling them to get out of the neighborhood. The message also included a death threat against Angel and the Sanzaros. Phelps and the Board were informed about this spray painted message.
iv. On approximately June 22, 2009, the Sanzaros received by mail another letter which read in part: "We can tell by the message painted on your garage that [anonymous homeowner A Concerned Ardiente Resident] ACAR wants you more than gone.... Dogs are not allowed in the clubhouse unless it is a service animal. Laury [Phelps] and Jim [Marsh] have told us several times that your dog is not a service animal.... Why won't you give Laury the documents that she wants and end your fight? We all know why. We know you cannot prove that Debbie [Sanzaro] is disabled and that her little dog is a service animal.... Stop bad mouthing Laury. You two are LIARS! You two are GARBAGE in the eyes of this community. Get the hell out of our community. We hate you for what you are doing to Laury." The letter was signed by "The Ardiente Residents for Solidarity."
v. On approximately August 18, 2009, the Sanzaros received by mail another letter from an anonymous individual, signed "A Concerned Ardiente Resident." The letter stated in part: "YOU LOST THE FIGHT AND MUST NOW PAY $ 19,000. GREAT NEWS! LAURY PHELPS SAID THE ARBITRATOR RULED THAT YOUR DOG IS NOT A SERVICE ANIMAL. THIS IS THE SAME THING SHE HAS ALWAYS SAID. LAURY ALSO SAID THAT THE ARBITRATOR RULES THAT ALL OF THE BOARDS [sic] ACTIONS HAVE BEEN LEGAL. THE BOARD HAS NEVER DONE ANYTHING WRONG.... UNFORTUNATELY WE WERE TOLD THAT OUR ASSOCIATION MUST PAY THE ALMOST $ 19,000 IN LEGAL FEES UNTIL THEY GET PAY[M]ENT FROM YOU. YOUR LAWSUIT HAS COST OUR COMMUNITY A LOT OF MONEY. OUR MEMBERS FOR SOLIDARITY HAVE TRIED AND FAILED TO FORCE YOU TO LEAVE OUR COMMUNITY BY MAKING YOU TWO SOCIAL OUTCASTS. LAURY PHELPS SAID WE CAN FORCE YOU TO LEAVE BY FORECLOSING ON YOUR HOUSE FOR THE $ 19,000 YOU OWE US. WHY DON'T YOU PAY US NOW AND LEAVE. SAVE US THE TIME AND MONEY TO FORECLOSE ON YOU. AS A MEMBER OF THE ARDIENTE RESIDENTS FOR SOLIDARITY WE DO NOT WANT YOU LIVING IN OUR COMMUNITY."
vi. Plaintiffs filed a police report regarding the anonymous letters and the graffiti on their garage, and although an investigation was commenced, Plaintiffs never discovered the identity of the individuals that took these actions.
*1170 i. On April 9, 2009, counsel for the HOA sent Plaintiffs a letter with the results of the March 30, 2009 hearing. According to the letter, the Board found that Mrs. Sanzaro's entry into the clubhouse with Angel and subsequent failure to provide documentation about the dog's abilities as a service animal, was a violation of the HOA Rules & Regulations.[2] The Board found a second violation, as Mrs. Sanzaro brought Angel into the clubhouse on March 13, 2009. Plaintiffs were assessed a $ 100 fine for the March 11, 2009 incident and a $ 100 fine for Mrs. Sanzaro's entry into the clubhouse with Angel on March 13, 2009. Plaintiffs were also advised that they were required to pay the attorneys' fees and costs incurred by the HOA for enforcing its governing documents, in the amount of $ 752. The letter stated that the $ 200 fine would be waived if there was no subsequent violation during the next six months, but that fines would be imposed for any further violation.
5. 2009 NRED Arbitration
a. Plaintiffs filed a complaint with the Nevada Real Estate Division ("NRED") against (1) Corona; (2) Ardiente; (3) non-party Linda Kemper ("Kemper"), a member of the HOA Board at the time; (4) Marsh, as Board President; (5) Phelps, as Community Manager and an employee of RMI; and (6) RMI. The claim was submitted to a non-binding arbitrator.
b. On July 27, 2009, a non-binding arbitration was held before the NRED. Plaintiffs were in attendance, as well as a representative of Corona, a representative of Ardiente, Kemper, Marsh, Phelps, and a representative of RMI, as well as their counsel.
c. During the arbitration, Mrs. Sanzaro testified that Angel provided assistance by helping Mrs. Sanzaro manage acute pain attacks arising from her disability.
d. The same day, at the request of the arbitrator, Plaintiffs sent a fax to the arbitrator with the following documents: (1) a doctor's statement requesting that Angel be registered as a service dog; (2) a notice of entitlement to disability benefits from the Social Security Administration; (3) a doctor's statement regarding Mrs. Sanzaro's disability; and (4) a statement from Mrs. Sanzaro explaining how Angel has been trained to assist her with her disabilities. Copies of the documents were also sent to counsel for the parties that attended the arbitration.
e. Representatives from Ardiente, Corona, and RMI, as well as Phelps, heard Mrs. Sanzaro explain how Angel assists her and received the information from the documents Plaintiffs submitted for the arbitration.
f. As a result of the faxed documentation being provided to Phelps and representatives of Ardiente, Corona, and RMI, Defendant Harris, as a member of the Board and representative of Corona during the time of the arbitration, became aware, at least as of this correspondence and testimony, of Mrs. Sanzaro's disability which resulted in a physical impairment that significantly impaired her ability to walk and Angel's assistance *1171 to her as a service animal. This information was undisputed.
g. On August 6, 2009, NRED Arbitrator Ara Shirinian entered a non-binding arbitration award in favor of Ardiente. The arbitrator found in part that "Mrs. Sanzaro's self-serving letter and a signed post-card to a private for-profit company without explanation of why the dog is needed by Mrs. Sanzaro [was] unpersuasive." The arbitrator awarded fines related to the violations of the Ardiente governing documents as well as attorneys' fees incurred in the course of the arbitration.
h. The arbitration was upheld by the Eighth Judicial District Court of Clark County, Nevada as well as by the Nevada Supreme Court.
6. July 2010 Incident and Interactions between Plaintiffs and Defendants
a. Incident 2 occurred at the clubhouse on July 26, 2010. On that date, the Sanzaros attempted to enter the clubhouse to purchase a gate transponder, accompanied by Angel. During this incident, the Sanzaros were told that they could not come into the clubhouse unless they provided more documentation about Mrs. Sanzaro's disability and Angel's services, despite the documentation the Sanzaros provided to Ardiente, Corona, RMI, and Phelps in July 2009 as part of the NRED arbitration.
b. Following Incident 2, Mr. Sanzaro sent a letter to Corona; Shea Homes, and Harris, as representatives of the Declarant; and Kemper, Smith, and non-party Sal Sirna ("Sirna") as members of the Board. In the letter, Mr. Sanzaro stated that he was lodging a formal written complaint against Phelps for disability discrimination. He also accused the Board of failing to properly supervise Phelps in her role as Community Manager.
c. Mr. Sanzaro sent a similar letter directly to Phelps on August 1, 2010. In the letter, Mr. Sanzaro requested a response to his allegations.
d. On August 1, 2010, Phelps sent a response letter to Mr. Sanzaro, on behalf of the Ardiente Board. She stated in part: "[U]ntil you provide proof that the dog in question is a registered service dog, I will have to respectfully disagree with your opinion. Unless you have recently provided documentation that we are not aware of, the dog is not a registered service dog and, therefore, I did not violate any of your rights."
e. On August 8, 2010, Mr. Sanzaro sent separate letters to Corona, Smith, and Harris, detailing his allegation of disability discrimination by Phelps, noting her disability and describing Mrs. Sanzaro's need to access the Ardiente clubhouse. Mr. Sanzaro wrote that Mrs. Sanzaro required use of, amongst other things, the gym, sauna, pool, Jacuzzi, and library, but was being denied access to the clubhouse.
f. As a result of the letters from Mr. Sanzaro, at least by August 8, 2010, Smith was aware of Mrs. Sanzaro's disability which resulted in a physical impairment that significantly impaired her ability to walk.
g. Between September 2010 and December 2010, Plaintiffs sent letters to Corona and to individual Board members, including Smith, requesting mitigation and use of the Ardiente clubhouse.
*1172 h. On January 20, 2011, counsel for Ardiente sent Plaintiffs a letter rejecting their requests to use the clubhouse. The letter stated in part: "[Y]ou still need to provide the Board with records and/or documents that demonstrate that Mrs. Sanzaro has such an impairment which affects one or more of her major life activities, and that the impairment is related to the need for her having the dog in question residing with her and accompanying her into the Common Areas [of the Ardiente community].... [Ardiente's] request that you provide the proper documentation evidencing a certificate of training as a service dog for the chihuahua is well founded in Federal law.... You still have failed to furnish the proper documentation that the Association has been requesting since March 2009. Until such time that you furnish such documentation you will not be allowed to bring the Chihuahua into the [Ardiente] clubhouse as it is a violation of the [Ardiente] Rules and Regulations." The Ardiente Board was copied on this letter, which included Smith.
i. On January 22, 2011, Mr. Sanzaro sent a letter to Corona, Shea Homes, and Harris, as representatives of the Declarant, and non-party Margo Hughen ("Hughen"), Smith, and Sirna as members of the Board, responding to the January 20, 2011 letter. Mr. Sanzaro disputed that documentation or certification of Angel's abilities was required by law, and stated that he and his wife, along with Angel, would appear at the clubhouse on January 29, 2011 at 4:00pm for the purpose of regaining access to the clubhouse. He requested that Board Members, representatives of Corona, and counsel for Ardiente be present on that date.
7. The January 2011 Incident
a. Incident 3 took place on January 29, 2011, when the Sanzaros appeared with Angel at the Ardiente clubhouse. Non-party Ron Winkel ("Winkel") was the Community Manager at the time, and had replaced Phelps at some point in 2010. Winkel refused the Sanzaros' entry into the clubhouse, and told them that the Board would not allow them to come into the Ardiente clubhouse with the dog until they provided documents that Angel was a service animal. Feeling intimidated by Winkel's presence, the Sanzaros left the clubhouse with Angel.
8. Other Actions Taken Against the Sanzaros
a. Following the assessments of fines and attorneys' fees and costs in conjunction with the incidents described above, Ardiente initiated foreclosure proceedings against the Sanzaros.
i. On August 28, 2009, a Lien for Delinquent Assessments in the amount of $ 2,590.80 was recorded against Plaintiffs.
ii. A Notice of Default and Election to Sell was recorded against Plaintiffs' home on October 13, 2009. Pursuant to the Notice, Plaintiffs owed $ 3,608.80 in assessments to the HOA.
b. As a result of the foreclosure proceedings being initiated, the Sanzaros were forced to file for Chapter 11 bankruptcy in August 2010.
c. Plaintiffs' debt was not discharged until October 28, 2013. Up to that date, they received notifications that their Ardiente home was in foreclosure.
*1173 Prior to the discharge, Plaintiffs made payments to non-party Red Rock Financial Services, the debt collector for Ardiente, in the amount of $ 4,011.40.
V. CONCLUSIONS OF LAW
A. Plaintiffs' Claims Under the ADA
i. Legal Standard
Title III of the ADA prohibits discrimination in public accommodations, stating that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a) (2009) ; Kohler v. Bed Bath & Beyond of California, LLC, 780 F.3d 1260, 1263 (9th Cir. 2015) (quoting Molski v. M.J. Cable, Inc., 481 F.3d 724, 730 (9th Cir. 2007) ). To prevail on a Title III discrimination claim, the plaintiff must show that (1) she is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the defendant because of her disability. Molski, 481 F.3d at 730.
In the context of ADA discrimination claims pertaining to service animals in particular, discrimination is defined in part as "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities ...." 42 U.S.C. § 12182(b)(2)(A)(ii) (2009). The Department of Justice issued ADA regulations which state in part: "[g]enerally, a public accommodation shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability." 28 C.F.R. § 36.302(c)(1) (2009). "By this regulation the Department of Justice intended that 'the broadest feasible access be provided to service animals in all places of public accommodation[.]' " Lentini v. Cal. Ctr. for the Arts, Escondido, 370 F.3d 837, 843 (9th Cir. 2004) (citation omitted). However, failure to make such modifications does not automatically constitute discrimination where the entity " 'can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations ....' " Id. at 844 (alteration in original) (quoting 42 U.S.C. § 12182(b)(2)(A)(ii) ). The Supreme Court has articulated different inquiries to make this determination: "whether the requested modification is 'reasonable,' whether it is 'necessary' for the disabled individual, and whether it would 'fundamentally alter the nature of' the [goods, services, etc.]." Id. (quoting PGA Tour, Inc. v. Martin, 532 U.S. 661, 683 n.38, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001) ).
ii. Discussion
1. Mrs. Sanzaro is Disabled Under the ADA
All Defendants concede that Mrs. Sanzaro is a disabled individual and has had a disability at all relevant times during the events described above. Therefore, in consideration of the facts presented at trial, the Court finds that Mrs. Sanzaro is disabled as a matter of law. The Court also finds that she provided sufficient documentation about her disability to all Defendants. HOA Defendant Ardiente and business entity Defendants Corona and RMI were aware of Mrs. Sanzaro's disability at least as of July 27, 2009, the date of the NRED arbitration.
*1174 2. The Ardiente Clubhouse is Not a Place of Public Accommodation
42 U.S.C. § 12181(7) provides a list of private entities that are considered public accommodations for the purposes of the ADA, if those entities engage in operations that affect commerce. The majority of the listed examples - including movie theaters and other places of entertainment, convention centers and other places of public gathering, and elementary schools and other places of education - are not analogous to the community facilities within an HOA. However, the statute includes as a place of accommodation "an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residents of such proprietor ...." 42 U.S.C. § 12181(7)(A) (2009). Despite this broad list of examples, the ADA does not apply to "private clubs or establishments exempted from coverage under Title II of the Civil Rights Act of 1964 (42 U.S.C. 2000-a(e) ) ...." 42 U.S.C. § 12187 (2009). The Court must therefore determine whether the Ardiente clubhouse can be considered a place of lodging, such that it qualifies as a public accommodation under the ADA, or whether the clubhouse is a private establishment exempted from the ADA.
The Court finds that the Ardiente clubhouse does not qualify as a place of public accommodation. The Court finds that the entire Ardiente community including the Ardiente clubhouse was a private establishment. Although members of the public were invited to stay overnight in an Ardiente model home and were permitted to use the clubhouse during their stay, the Court finds that the general public did not have unrestricted, general or even limited access to the clubhouse. See Jankey v. Twentieth Century Fox Film Corp., 212 F.3d 1159, 1161 (9th Cir. 2000) ("[Plaintiff's] argument is premised on the assumption that if a facility falls within a § 12181 category, the [ADA] applies regardless of whether it is open to the public. This argument, for which we have found no support, ignores the plain language of § 12187 which ... [like Title II] exempts from coverage any 'private club or other establishment not in fact open to the public. ' ") (alteration in original) (citation omitted); see also Clegg v. Cult Awareness Network, 18 F.3d 752, 755 n.3 (9th Cir. 1994) ("Congress ... has drawn a distinction between [an] organization-a private club-and the facilities the organization operates. Only when the facilities are open to the public at large does Title II govern.").
As a general matter, the Ardiente clubhouse and the overall community were not open to the general public. Members of the community could only access entry by use of a transponder to open the gates. Non-resident access to the community including the clubhouse required either obtaining permission for limited access from the community office, being escorted by a member of the community or being provided access by a member of the community. For those members of the public that participated in the "Stay and Play" and "Taste of the Good Life" programs, there was a condition imposed on their stay - namely, those guests had to explicitly indicate an interest in writing in purchasing a home within the Ardiente community prior to staying in the model home and obtaining access to the Ardiente clubhouse. The homes used for this program and the Ardiente clubhouse access provided with the programs were not open to the public as they would be for a hotel. This access was never advertised to the general public as an accommodation where individuals could simply pay money to stay, as they would with a hotel. Any member of the public *1175 interested in using these facilities had to explicitly indicate their interest in exploring the possibility of purchasing a home in the community. As interested guests could not access the clubhouse without first meeting this condition, the Ardiente clubhouse cannot be considered a place of lodging open to the public generally.
As the Ardiente clubhouse does not qualify as a place of public accommodation, Plaintiffs cannot establish a claim for disability discrimination under the ADA.
B. Plaintiffs' Claims Under the FHA
i. Legal Standard
In the Ninth Circuit, a plaintiff can bring discrimination claims under the FHA and assert either a theory of disparate treatment or disparate impact. Gamble v. City of Escondido, 104 F.3d 300, 304-05 (9th Cir. 1997) (citations omitted). Additionally, a plaintiff may bring suit under the section 3604(f)(3)(B) of the Fair Housing Act Amendments ("FHAA") for failure to make reasonable accommodations in handicapped housing. Id. at 305 (citation omitted). To advance a disparate treatment discrimination claim, Plaintiffs must first show: (1) Mrs. Sanzaro is a member of a protected class; (2) Mrs. Sanzaro applied for and was qualified for use of the clubhouse with Angel; (3) Mrs. Sanzaro was denied use of the clubhouse with Angel; and (4) Defendants allowed similarly situated parties to use the clubhouse. See Sanghvi v. City of Claremont, 328 F.3d 532, 536 (9th Cir. 2003) (citing Gamble, 104 F.3d at 305 ). Once Plaintiffs have established the prima facie case, the burden shifts to Defendants to "to articulate a legitimate, nondiscriminatory reason for its action." Gamble, 104 F.3d at 305. Finally, Plaintiffs must show by a preponderance of evidence that Defendants' proffered reason is pretextual. Id.
Regarding reasonable accommodation claims under the FHA, unlawful discrimination includes a housing provider's "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B) (2009). A plaintiff must prove five elements to prevail on an FHA reasonable accommodation claim under § 3604(f)(3)(B) : "(1) that the plaintiff or his associate is handicapped within the meaning of 42 U.S.C. § 3602(h) ; (2) that the defendant knew or should reasonably be expected to know of the handicap; (3) that accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that defendant refused to make the requested accommodation." Dubois v. Ass'n of Apartment Owners of 2987 Kalakaua, 453 F.3d 1175, 1179 (9th Cir. 2006) (citations omitted), cert. denied, 549 U.S. 1216, 127 S.Ct. 1267, 167 L.Ed.2d 92 (2007). "The reasonable accommodation inquiry is highly fact-specific, requiring case-by-case determination." Id. (quoting United States v. Cal. Mobile Home Park Mgmt. Co., 107 F.3d 1374, 1380 (9th Cir. 1997) ).
Although the FHA does not explicitly allow plaintiffs to assert a theory of vicarious liability for individual and business entity agents or employees acting on behalf of principals or employers, the Supreme Court has held that "it is well established that the [Fair Housing] Act provides for vicarious liability." Meyer v. Holley, 537 U.S. 280, 285, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003). This is because "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules." Id. (citations omitted). Therefore, in determining *1176 whether an employer or principal can be held liable for the acts of an agent or employee, the Court must apply traditional vicarious liability rules which permit a finding of liability where the employee or agent acted within the scope of employment or agency. Id. (citations omitted). However, absent special circumstances, an officer or owner of a business entity may not be held vicariously liable, as it is the business entity that is the principal or employer. Id. at 286, 123 S.Ct. 824 (citations omitted).
ii. Discussion[3]
1. Ardiente, Corona, and RMI qualify as Housing Providers under the FHA
The Court first finds that the FHA applies to the HOA Defendant and the business entity Defendants in this case. Although Defendants do not contest the applicability of the FHA, the Court briefly addresses its scope. In agency guidance regarding reasonable accommodations under the FHA, the Department of Housing and Urban Development ("HUD") and the Department of Justice ("DOJ") recognized that the statute applies broadly and covers "individuals, corporations, associations and others involved in the provision of housing and residential lending, including property owners, housing managers, homeowners and condominium associations, lenders, real estate agents, and brokerage services." Joint Statement of the Dep't of Housing and Urban Dev. and the Dep't of Justice, Reasonable Accommodations Under the Fair Housing Act (May 17, 2004) ("HUD and DOJ Joint Statement"), at 3, https://www.hud.gov/sites/documents/DOC_7771.PDF.[4] As the HOA, Ardiente is a provider of private residential housing and is required to follow the FHA in the sale of housing and in the provision of reasonable modifications and accommodations for use and enjoyment of those properties. As Declarant and developer of the community, Corona was also bound by the FHA and can be held liable for violations of its provisions. As the former property management company, RMI is also may be held liable for engaging in activity prohibited by the FHA.
As discussed below, these entities are vicariously liable for the acts of their agents and employees.
2. Mrs. Sanzaro is Handicapped Under the FHA
As discussed above in the context of ADA disability discrimination, the parties no longer dispute that Mrs. Sanzaro qualifies as handicapped under the FHA.[5] Based upon the evidence presented at trial, *1177 the Court concludes as a matter of law that Mrs. Sanzaro has been, at all relevant times, a handicapped individual as defined by the FHA.
3. Defendants Were Reasonably Expected to Know of Mrs. Sanzaro's Handicap
The Court finds that all Defendants knew and could reasonably have been expected to know of Mrs. Sanzaro's handicap. They knew that her handicap requires the use of a walker, and Defendants do not dispute that her impairment was a visible one. Ardiente, through the Board members involved in the Incidents as well as correspondence from the Sanzaros, knew that Mrs. Sanzaro had a permanent handicap. Corona, as Declarant, had members on the Board during the three Incidents, and also knew of Mrs. Sanzaro's handicap. RMI, as employer of the Community Manager, knew of Mrs. Sanzaro's handicap through its representation at the NRED arbitration and being named as a party in the Sanzaros' agency actions. Phelps was present at the NRED arbitration, and testified at trial that she knew that Mrs. Sanzaro had a handicap which significantly impaired her mobility. The Court therefore finds that by the July 27, 2009 arbitration these Defendants knew Ms. Sanzaro was disabled and that Angel assisted her with her disability when she had acute pain attacks. The Court also finds that they did not have any information that disputed this.
Smith and Harris, serving on the Board at the behest of the Declarant, knew of Mrs. Sanzaro's handicap due to their service on the Board and involvement in the decisions to exclude her and Mr. Sanzaro from the clubhouse with Angel. These Defendants thus knew that Mrs. Sanzaro had a qualifying impairment. However, Defendant Wallace did not attend the NRED arbitration and did not directly communicate with the Sanzaros. The Court does not find that he knew or could reasonably be expected to have known of Mrs. Sanzaro's handicap.
4. An Accommodation was Necessary for Mrs. Sanzaro to Use and Enjoy the Clubhouse
The Court finds that Mrs. Sanzaro was unable to use and enjoy the clubhouse without an accommodation related to her disability. The Court further finds that access to the clubhouse was necessary for the Sanzaros' enjoyment of their home or dwelling. First, the clubhouse provided various programming and a community meeting place for enjoyment by all homeowners in the community. Homeowners understood its programming, facilities, and meeting spaces to be an integral part of being a homeowner in the community. The Sanzaros purchased their home within the Ardiente community with the expectation that they would be able to use and enjoy the home with the shared amenities in the clubhouse. Indeed, the promotional materials published in the local newspaper advertising the Ardiente community specifically referred to the clubhouse amenities, for the purpose of enticing potential buyers. A buyer of a Shea Homes property not only purchases a home but also purchases access to community facilities that are only available to members of that community. Indeed, that is why clubhouse access and use was an explicit part of the marketing programs, such as "Stay and Play." Second, the clubhouse was necessary for the enjoyment of the Sanzaros' home because it contained the office for the community. The office supported homeowners enjoyment of and access to their actual homes by providing, for example, the gate transponder devices that homeowners needed to enter the community itself. Thus, without access to the clubhouse, there could be no access to the community itself by a homeowner. When members of the community *1178 had issues within Ardiente the office in the clubhouse was the initial contact point for resolving issues under the jurisdiction or control of the HOA. The Court finds factually that Mrs. Sanzaro required regular and continuous access to the clubhouse to have full enjoyment of and access to her actual home.
The Court also separately finds that the Ardiente clubhouse qualifies as a dwelling under the FHA. A "dwelling" is defined as: "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." 42 U.S.C. § 3602(b) (2009). Departmental regulations include public spaces and common use areas in the definition of "dwelling." 24 C.F.R. § 100.204 (2009). The FHA applies to property owners, housing managers, and homeowners and condominium associations. HUD and DOJ Joint Statement, at 3. The Court's finding that the FHA applies to the Ardiente clubhouse thus naturally follows as a reasonable interpretation of HUD guidance.
For these reasons stated, Mrs. Sanzaro required an accommodation to realize her expectation to use and enjoy the Ardiente clubhouse.
5. Permitting Angel to Accompany Mrs. Sanzaro in the Clubhouse was a Reasonable Accommodation
The Court finds that Angel qualifies as a service animal under the FHA, and Angel's entry into the clubhouse was a reasonable accommodation for Mrs. Sanzaro. In response to public comment, HUD provided guidance regarding the definition of "service animal." Pursuant to the 2008 Final Rule on public housing regulations, a housing provider may verify that a disability exists, and inquire as to the need for accommodation such as a service animal, if neither the disability nor the need is "readily apparent." Preamble to Final Rule, Pet Ownership for the Elderly and Persons With Disabilities, 73 Fed. Reg. 63,833, 63,835 (Oct. 27, 2008).[6] HUD further clarified that, so long as a person with a disability demonstrates a nexus between the disability and the service the animal provides, specialized training is not required, as "[s]ome animals perform tasks that require training, and others provide assistance that does not require training." Id.
The Court finds that Angel assisted Mrs. Sanzaro with her acute pain attacks and with retrieving her walker. Except for Wallace, all Defendants knew that Angel provided this assistance to Mrs. Sanzaro, because she testified as such during the NRED arbitration and she provided documentation. The Court finds that these Defendants understood and knew that Angel provided these services. These Defendants also knew that Angel did not pose a risk or threat of harm to anyone in the clubhouse or in the community.
In this case, there is a clear nexus between Mrs. Sanzaro's disability and the services that Angel provides. Mrs. Sanzaro's disability involved difficulty walking and acute and debilitating pain attacks. Angel was trained and offered assistance with both of these aspects of her disability. Angel assisted Mr. Sanzaro with the alleviation of pain during an acute attack. Angel assisted Mrs. Sanzaro with having constant and easy access to her walker since she is unable to walk without her walker.
*1179 Moreover, Defendants have not identified why the accommodation would have been unreasonable. Angel was not disruptive, threatening or harmful to other residents in the community or in the clubhouse. She was so inconspicuous due to her small size and quiet disposition that individuals in the clubhouse entry often did not even notice her. The accommodation to allow Angel to accompany Mrs. Sanzaro into the clubhouse was clearly reasonable based upon the evidence introduced at trial.
6. Defendants Refused to Make the Requested Accommodation
There is no dispute that, on each of the three Incidents discussed above, Defendants Harris, Smith, and Phelps directly refused to accommodate the Sanzaros' request to bring Angel into the clubhouse. The other Defendants were aware of the Sanzaros' request for an accommodation and either approved of or ratified the denial of request for an accommodation. Ardiente as HOA directly refused the accommodation. Corona and RMI in addition to being directly contacted were vicariously liable for the acts of their agents or employees whom they oversaw and directed.
In addition to refusing the Sanzaros' entry with Angel, the Court finds factually that these Defendants repeatedly asked Plaintiffs for more documentation regarding Angel's services even when they knew the assistance she provided and had sufficient documentation of Angel's assistance as a service animal. Defendants all insisted on this documentation, in violation of the FHA. These Defendants, as well as Ardiente, Corona, and RMI as principals, are liable for failure to provide a reasonable accommodation to the Sanzaros.
The Court further notes that at no point were the Sanzaros required to submit a written request for accommodation even though they did make such a written request. See HUD and DOJ Joint Statement, at 10 ("An applicant or resident is not entitled to receive a reasonable accommodation unless she requests one. However, the Fair Housing Act does not require that a request be made in a particular manner or at a particular time.... [T]he requester must make the request in a manner that a reasonable person would understand to be a request for an exception, change, or adjustment to a rule, policy, practice, or service because of a disability... [and] a reasonable accommodation request can be made orally or in writing ...."). All Defendants knew from the Sanzaros' actions and communications, including correspondence, that they were seeking an accommodation to allow Mrs. Sanzaro to bring Angel into the clubhouse with her. Each time the Sanzaros entered or attempted to enter the clubhouse with Angel, it was clear that they were seeking an exception to the policy of animals being prohibited in the clubhouse. This request was reinforced by the Sanzaros' communications and submission of documentation related to Angel. The Sanzaros also explicitly made a request for Angel to be allowed into the clubhouse. These Defendants' refusal to allow the Sanzaros to enter the clubhouse with Angel therefore constitutes a failure to reasonably accommodate their request.
The Court therefore finds in favor of Plaintiffs against all of Defendants, except Defendant Wallace, on their FHA reasonable accommodation claim.
C. Plaintiffs' Claims Under NRS § 651.075
i. Legal Standard
Under Nevada law, "public accommodation" has a similar definition as set forth in the ADA. NRS § 651.050 (2009). Nevada law provides that it "is unlawful for a place of public accommodation to: (a) Refuse admittance *1180 or service to a person with a disability because the person is accompanied by a service animal" and "(f) Require proof that an animal is a service animal or service animal in training." NRS § 651.075(1) (2009); See, e.g., Clark Cty. Sch. Dist. v. Buchanan, 112 Nev. 1146, 924 P.2d 716, 719 (1996) (applying NRS § 651.075(1) to a plaintiff training a service dog). However, "[a] place of public accommodation may: (a) Ask a person accompanied by an animal: (1) If the animal is a service animal or service animal in training; and (2) What tasks the animal is trained to perform or is being trained to perform." NRS § 651.075(2) (2009). At the time of Incident 1, a service animal was defined under Nevada law as "an animal that has been trained to assist or accommodate a person with a disability." NRS § 426.097 (2009).
ii. Discussion
Plaintiffs' claim under NRS § 651.075 fails for the same reasons noted above regarding their ADA claim. The Ardiente community and clubhouse were part of a private establishment and cannot be considered public accommodations.
D. Damages
Based on its reasoning set forth above, the Court finds that damages are only available to Plaintiffs for violations of the FHA.
Under the FHA, a plaintiff may seek actual and punitive damages, as well as injunctive relief, if the court finds evidence of a discriminatory housing practice. 42 U.S.C. § 3613(c)(1). In an action under the FHA, if a plaintiff establishes actual damages, the Court is required to award compensatory damages. U.S. v. City of Hayward, 36 F.3d 832, 839 (9th Cir. 1994) (citations omitted). "Although compensatory damages need not be determined with certainty, they may not be based upon 'mere speculation or guess.' " Silver Sage Partners, LTD v. City of Desert Hot Springs, 251 F.3d 814, 824 (9th Cir. 2001) (quoting Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931) ). While a court may award lump sum damages, a damages award must be sufficiently detailed. See Simeonoff v. Hiner, 249 F.3d 883, 891-92 (9th Cir. 2001) (finding that lump sum awards of $ 6500 for past lost wages and $ 130,000 for future lost wages did not specify how the amounts were calculated but that "the district court's findings of fact are adequately detailed to permit meaningful appellate review of any substantive challenge"). The Ninth Circuit will not reverse an award for damages "unless it is clearly unsupported by evidence, or it shocks the conscience." Id. at 893 (citation and quotation marks omitted).
To obtain punitive damages under the FHA, a plaintiff must show that defendants acted with reckless indifference. Fair Hous. Council of San Diego, Joann Reed v. Penasquitos Casablanca Owner's Ass'n, 381 Fed. Appx. 674, 676-77 (9th Cir. 2010) (citing Fair Housing of Marin v. Combs, 285 F.3d 899, 906 (9th Cir. 2002) ). Reckless indifference is found where a defendant, at minimum, "discriminate[s] in the face of a perceived risk that its actions will violate federal law" but does not require that defendant "engage in conduct with some independent, egregious quality" to be subject to punitive damages. Id. (quoting Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535, 537, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) ).
i. Compensatory Damages
The Court finds that Plaintiffs have established actual damages resulting from the failure of a reasonable accommodation being provided. The Court finds that Plaintiffs have established non-economic damages under the requisite legal standard. Plaintiffs incurred non-economic *1181 damages including pain and suffering, humiliation, and emotional distress due to being driven out of their Ardiente home, facing death threats and harassment from community members, being undermined publicly and privately by the Ardiente Board and Phelps, having to file bankruptcy, and being unable to use and enjoy the Ardiente clubhouse facilities with Angel for several years. The Court therefore imposes compensatory damages for these non-economic damages in the amount of $ 350,000 against Defendants Harris, Smith, Phelps, Ardiente, Corona, and RMI. These damages are joint and several. The Court's award is based upon the findings in this case, and the Court emphasizes the salient findings as to each defendant below.
The Court awards compensatory damages against Harris as an agent of Ardiente and Corona during the time of the first Incident. The Court finds that Harris is liable for requiring the Sanzaros to provide documentation that the FHA did not require. Harris approved Phelps's communications on behalf of the Board that prevented the Sanzaros from using the Ardiente clubhouse with Angel without providing the requested documentation. Harris is additionally liable for ratifying the assessment of fines against the Sanzaros for bringing Angel into the Ardiente clubhouse in March 2009. Further, Harris directed Phelps to exclude the Sanzaros from the Ardiente clubhouse with Angel between March 2009 and February 2010.
The Court similarly awards compensatory damages against Smith as an agent of Ardiente and Corona during the time of Incidents 2 and 3. The Court finds that Smith participated in the decisions to continue to exclude the Sanzaros and Angel from the Ardiente clubhouse and unlawfully require certification of Angel's training between 2010 and 2013.
The Court imposes compensatory damages against Phelps as Community Manager and an agent of RMI. During Incident 1, Phelps initially excluded Mrs. Sanzaro from the Ardiente clubhouse and called HOA security because Angel was present in the facility despite Mrs. Sanzaro using Angel as an assistance animal at that time. Following the first Incident, Phelps sent multiple emails to other Ardiente homeowners with misleading information about the legal requirements for service animals, cultivating the atmosphere of open hostility toward the Sanzaros. Phelps attended the NRED arbitration and heard Mrs. Sanzaro testify about Angel's assistance tasks, and nonetheless continued to prevent the Sanzaros from obtaining a reasonable accommodation to use the clubhouse. Phelps's requests for documentation and certification were improper and her conduct was motivated by personal animus against the Sanzaros.
The Court imposes compensatory damages against Ardiente. The Court finds that Ardiente, through its Board of Directors, directed the exclusion of the Sanzaros and Angel from the clubhouse during all three Incidents. The Board, on behalf of Ardiente, also imposed fines upon the Sanzaros and required them to provide certification and other documentation related to Angel's training, despite the Sanzaros providing sufficient information in July 2009 to allow the Board to evaluate the nexus between Mrs. Sanzaro's disability and her need for Angel. The Board also took no action to address or mitigate the hostility and threats expressed by other members of the Ardiente community toward the Sanzaros, and in fact fomented this hostility. Additionally, Ardiente failed to train its Board members on the requirements of discrimination law.
*1182 The Court awards compensatory damages against Corona as a principal of Harris and Smith and for ratifying their actions. The Court finds that, pursuant to Ardiente's governing documents, Corona, as Declarant, had the authority to appoint and did appoint and oversee voting members to the Ardiente Board during the Incidents at issue in this case. Corona exercised this authority and maintained majority representation on the Board until sometime in 2010. It retained representation during 2011, even though it no longer had majority control of the Board. Therefore, during all three Incidents, Corona had at least one voting member on the Ardiente Board. Corona is liable for actions described above, including the exclusion of the Sanzaros and Angel from the clubhouse and the failure to address at Board meetings or in correspondence with homeowners the threats against the Sanzaros. Corona also failed to train its Board representatives on the requirements of discrimination law.
The Court awards compensatory damages against RMI as a principal and employer of Phelps and for ratifying and directing her actions. The Court finds that RMI failed to properly train Phelps on the requirements of federal and state discrimination law. RMI received complaints from the Sanzaros in 2009 following the first Incident, and nevertheless failed to inform Phelps that the law did not require the Sanzaros to provide further documentation of Angel's training. Neither federal nor state law operative in 2009 required any particular certification for a service animal. Furthermore, RMI sent a representative to the 2009 NRED arbitration, where Mrs. Sanzaro testified about how Angel assisted her. RMI received documentation from the Sanzaros about how Angel assisted Mrs. Sanzaro immediately after the NRED arbitration - that documentation was sufficient to establish that Mrs. Sanzaro was disabled and required assistance from Angel which included bringing Angel into the Ardiente clubhouse.
The Court declines to impose liability or damages against Wallace, CEO of RMI. The Court finds that vicarious liability cannot be imposed against Defendant Wallace, pursuant to Meyer v. Holley. Plaintiffs have produced no evidence that Wallace directly participated in the denial of the reasonable accommodation or ratified its denial. As Wallace cannot be held liable merely for being an owner or officer of RMI, the Court does not award any damages against this Defendant.
ii. Punitive Damages
The Court finds that certain Defendants acted with reckless indifference as to the rights of disabled individuals seeking reasonable accommodations. The Court therefore awards punitive damages to the Plaintiffs in the amount of $ 285,000 and finds that this amount appropriately "punish[es] unlawful conduct and deter[s] its repetition." Philip Morris USA v. Williams, 549 U.S. 346, 352, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007) (citations and quotation marks omitted). The Court finds that the conduct of Defendants Ardiente, Harris, Smith, and Phelps in the violation of the Plaintiffs' rights under the FHA warrants the imposition of punitive damages. This conduct includes, but is not limited to, (1) continuing to, in a harassing and malicious manner, request documentation about Mrs. Sanzaro's need for Angel's assistance even after sufficient documentation was provided to them regarding Mrs. Sanzaro's disability and the ways in which Angel assisted her; (2) actively and wantonly preventing the Sanzaros from using the clubhouse once that documentation was provided; (3) sending or directing to be sent communications on behalf of the Board that portrayed the Sanzaros as litigious and untruthful and knowing that *1183 such communications about the Sanzaros would contribute to a hostile, threatening and intimidating living environment; and (4) failing to discourage Ardiente residents from harassing and threatening the Sanzaros at open meetings and through anonymous letters. The Court further finds that these Defendants acted with personal animus toward the Sanzaros, which fueled the antagonism among the community.
Defendants Corona and RMI are vicariously liable for these reckless acts. At all times, these Defendants were aware of, oversaw and ratified the actions of their agents.
The Court, based upon the above findings, awards punitive damages as follows:
a. Defendant Ardiente: $ 150,000
b. Defendant Phelps: $ 25,000
c. Defendant Corona: $ 15,000
d. Defendant RMI: $ 75,000
e. Defendant Harris: $ 10,000
f. Defendant Smith: $ 10,000
iii. Injunctive Relief
In their Complaint, Plaintiffs make the following requests for injunctive relief: (1) Plaintiffs request that the Court enjoin Defendants from committing any further discriminatory acts; (2) Plaintiffs ask the Court to order Ardiente to incorporate policies and procedures for the disabled into their governing documents; and (3) Plaintiffs seek to enjoin Defendants from enforcing any future amendments to governing documents that have not been legally implemented by a majority vote of the HOA's members, recorded with the Clark County Recorder, and mailed to all members of the HOA. The Court does not find it appropriate to order injunctive relief at this time. Plaintiffs have essentially asked this Court to order that Defendants follow the law. This is not a proper basis for injunctive relief in this case.
E. Attorneys' fees and costs
The Court is authorized to award attorneys' fees and costs to the prevailing party in an FHA action. 42 U.S.C. § 3613(c)(2). The Court awards Plaintiffs attorneys' fees and costs to the extent available in an amount to be decided following the entry of Judgment.
VI. JUDGMENT
The Court finds in favor of Plaintiffs. The Court will award to Plaintiffs: $ 350,000 in compensatory damages, and $ 285,000 in punitive damages, pursuant to 42 U.S.C. § 3613(c)(1). The Court also awards attorneys' fees to the extent available and costs of litigation to Plaintiffs, pursuant to 42 U.S.C. § 3613(c)(2). Plaintiffs are ordered to submit a Motion for Attorneys' Fees and Costs and attached list of litigation costs to the Court within thirty days of entry of this order.
The Clerk of Court is instructed to enter judgment accordingly and to close this case.
VII. Outstanding Motion for Reconsideration
The Court now considers Plaintiffs' pending Motion for Reconsideration [ECF No. 432] of the Court's Order [ECF No. 403] taxing costs. The Court has reviewed the Court's Order and finds that the Order taxing costs is appropriate and shall not be reconsidered. To the extent that Plaintiffs have raised concerns about service, the Court is not convinced that there was not service. In any event, Plaintiffs have now viewed the itemization of costs and have not raised substantive or persuasive arguments as to the actual costs themselves. Moreover, the Court has now entered judgment as to all parties so there is no further issue of the Order being premature.
*1184 The Order taxing costs shall remain in effect for the full amount.
IT IS SO ORDERED.

All statutes cited herein refer to the operative versions in 2009, at the time of the first alleged incident of discrimination.

The specific Rule & Regulation Plaintiffs were alleged to have violated was Article V, Section A.2, which provided: "Except for handicap assistance, animals are prohibited in the clubhouse."

To the extent that any factual statements in this "Discussion" section are not explicitly noted in the "Factual Findings" section, see supra , the Court incorporates them by reference into that section and makes such additional factual statements as factual findings based upon the record and in support of the order here.

The Court finds it appropriate to rely upon this agency guidance where the FHA itself is unclear as to its scope. See National Cable & Telecomm. Ass'n v. Brand X Internet Serv., 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) ("If a statute is ambiguous, and if the implementing agency's construction is reasonable, Chevron requires a federal court to accept the agency's construction of the statute ....") (quoting Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843-44 & n.11, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ).

The terms "disabled" and "handicapped" can be used interchangeably, as the Supreme Court has recognized that "the ADA's definition of disability is drawn almost verbatim from the definition of "handicapped individual" included in the Rehabilitation Act of 1973 ... and the definition of "handicap" contained in the Fair Housing Amendments Act of 1988 .... Bragdon v. Abbott, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (citations omitted).

HUD also noted that there was no specific definition of the term "service animal," and used the term interchangeably with "assistance animal" in accordance with reasonable accommodation law.